**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

AVROHAM G.,
      Plaintiff,

    v.

LELAND DUDEK, ACTING
COMMISSIONER OF SOCIAL
SECURITY,
      Defendant.

No. 3:21-cv-526 (SRU)

## <u>ORDER</u>

The plaintiff, Avroham G.[1], commenced this action pursuant to 42 U.S.C. § 405(g) to

reverse the decision of the Commissioner of the Social Security Administration (the

"Commissioner") denying his disability insurance benefits under the Social Security Act

("SSA"). Avroham G. filed a motion for an order reversing the final decision of the

Commissioner. Doc. No. 51. The Commissioner has cross-moved for an order affirming the

decision. Doc. No. 57. For the following reasons, I **grant** Avroham G.'s motion to reverse the

decision of the Commissioner, doc. no. 51, and I **deny** the Commissioner's second motion to

affirm, doc. no. 57. I **deny as moot** the Commissioner's first motion to affirm, doc. no. 44.

## I.    Standard of Review

The SSA follows a five-step process to evaluate disability claims. *See Selian v. Astrue*,

708 F.3d 409, 417 (2d Cir. 2013). First, the Commissioner determines whether the claimant

currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d

Cir. 2015) (citing 20 C.F.R. § 404.1520(b)). "Second, if the claimant is not working, the

---

[1] As set forth in the January 8, 2021 Standing Order, the plaintiff is identified by his first name and last initial. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

Commissioner must determine whether the claimant has a 'severe' impairment," *i.e.*, a physical or mental impairment that limits his or her ability to do work-related activities. *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant has a severe impairment, the Commissioner determines whether the impairment is considered "*per se* disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not *per se* disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). A claimant's residual functional capacity ("RFC") is defined as "what the claimant can still do despite the limitations imposed by his impairment." *Id.* Fourth, the Commissioner decides whether the claimant's RFC allows him to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's [RFC] and vocational factors, whether the claimant can do other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g)); 20 C.F.R. § 404.1560(c). The process is sequential, meaning that a claimant is disabled only if he passes all five steps. *See id.*

"The claimant bears the ultimate burden of proving that he was disabled throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the five-step inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift to the Commissioner at step five." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). At step five, the Commissioner need show only that "there is work in the national economy that the claimant can

do; he need not provide additional evidence of the claimant's [RFC]." *Id.* (citing 20 C.F.R. § 404.1560(c)(2)).

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). *See also Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48 (internal citation and quotation marks omitted). Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To the extent that evidence in the record conflicts, it is within the ALJ's discretion to resolve those conflicts. *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417 (citing *Moran v. Astrue*, 569 F.3d at 112).

## II.    Background

The procedural history and facts set forth in Avroham G.'s motion to reverse are undisputed by the Commissioner. *See generally* Doc. No. 57-1; Doc. No. 51-1. I assume the

parties' familiarity with the record in this case and I discuss only the portions relevant to my decision.

Avroham G. previously filed an application for Supplemental Security Income benefits on October 11, 2007.  Doc. No. 51-1 at 2; Tr. 112.  He was issued a fully favorable administrative law judge ("ALJ") decision on February 24, 2009 based on a finding that his post-traumatic stress disorder disabled him.  Doc. No. 51-1 at 2-3; Tr. 109-116.  However, his benefits ceased when he was incarcerated for over one year.  Doc. No. 51-1 at 3 n.3.

Avroham G. filed an application for Social Security Disability Insurance benefits on or around December 29, 2017 claiming disability beginning on November 1, 2006.  Doc. No. 51-1 at 1; Tr. 275, 546.  His application was denied by notice dated March 27, 2018.  Doc. No. 51-1 at 1; Tr. 117-122.  On or about April 10, 2018, Avroham G. requested a hearing before an ALJ. Doc. No. 51-1 at 1; Tr. 123-125.  Avroham G. appeared at a hearing before ALJ Seth Grossman on March 19, 2019 without legal representation.  Doc. No. 51-1 at 1; Tr. 74-96.  The hearing was continued to seek additional records; a telephonic hearing on June 22, 2020 was also postponed to allow Avroham G. the opportunity to obtain counsel.  Doc. No. 51-1 at 1; Tr. 12, 70-73, 95.

ALJ Grossman held a telephonic hearing on August 24, 2020 "at which [Avroham G.], two medical experts, and a vocational witness testified."  Doc. No. 51-1 at 2; Tr. 34-66.  ALJ Grossman issued an unfavorable decision dated September 4, 2020 and Avroham G. requested review by the Appeals Council.  Doc. No. 51-1 at 2; Tr. 9-27, 270-273.  The Appeals Council denied the request for review and Avroham G. appealed the September 4, 2020 decision by filing a complaint in the District of Connecticut dated April 16, 2021.  Doc. No. 51-1 at 2; Doc. No. 1; Tr. 1-5, 620-626.  The Commissioner moved for remand pursuant to sentence six of 42 U.S.C. § 405(g) and I granted the Commissioner's motion.  Docs. No. 21-22.

4

The matter was remanded and a telephonic hearing was held before ALJ John Molleur ("ALJ Molleur") on February 15, 2022. Doc. No. 51-1 at 2; Tr. 575-619. Avroham G. appeared without counsel and a vocational witness testified. *Id.*

ALJ Molleur issued an unfavorable decision denying Avroham G.'s claim on May 31, 2022. Doc. No. 51-1 at 2; Tr. 543-574. Avroham G. filed written exceptions on June 8, 2022 which were ultimately declined by the Appeals Council on January 13, 2023. Doc. No. 51-1 at 2; Tr. 770-771, 537-540.

Avroham G. filed a *pro se* motion to reverse the decision of the Commissioner on July 19, 2024; the Commissioner filed a motion to affirm the decision of the Commissioner on November 18, 2024. Docs. No. 39, 44.

Attorney Katz entered an appearance on behalf of Avroham G. on December 20, 2024. Doc. No. 46. Attorney Katz withdrew Avroham G.'s *pro se* motion to reverse the Commissioner's decision and filed the instant motion to reverse the Commissioner's decision on March 6, 2025. Doc. No. 51. The Commissioner filed a second motion to affirm the Commissioner's decision on April 30, 2025. Doc. No. 57.

A. Medical Evidence

1. *Treatment History*

Avroham G. has a history of issues in his left wrist dating back to 2014, although documentation is sparse for much of that history. Doc. No. 51-1 at 3; Tr. 500-01. He sustained a work-related injury in February 2014 requiring surgery on his wrist and received a metal implant. Doc. No. 51-1 at 3; Tr. 500 (providing "post-operative instructions for hand and wrist surgery" from Montvale Surgical Center), 1082 (referencing four surgeries on left wrist since

2014 and a metal implant in September 2015 medical consultant report); Tr. 1634 (showing orthopedic injury on left wrist due to a slip and fall).

Avroham G. attended physical therapy from September 2015 to December of 2015. Doc. No. 51-1 at 3-4; Tr. 1082-1083, 491. His physical therapy evaluation noted functional limitations related to his left wrist including hand pain, difficulty with daily living activities and grasping objects, and being restricted to lifting no more than five pounds. Doc. No. 51-1 at 3-4; Tr. 491 (noting wrist pain); Tr. 488 (noting limitations of no heavy lifting and no pushing or pulling); Tr. 1082 (noting difficulties with activities of daily living); Tr. 1129 (indicating need for cane). He was discharged from physical therapy in December 2015 without any noted improvements and still complaining of left wrist pain. Doc. No. 51-1 at 4; Tr. 491.

Avroham G. was referred to a hand surgeon in January 2016. Doc. No. 51-1 at 4; Tr. 1128. The surgeon noted he had a "recurrent painful left wrist ganglion cyst" and recommended surgery to remove the ganglion cyst. Doc. No. 51-1 at 4; Tr. 1065. Avroham G. reported continued wrist pain and an increase in the size of the ganglion cyst in June 2016, and surgical excision of the cyst was recommended again in June 2017. Doc. No. 51-1 at 4; Tr. 492, 1106. Despite Avroham G.'s wrist pain, Dr. Robert Greene noted in an internal medicine examination on March 6, 2018 that his finger dexterity and grip strength were normal. Tr. at 407, 410.

Although records indicate Avroham G. saw orthopedic surgeons Dr. Mukund Patel and Dr. Eltan Melamed about having surgery on his left wrist in April and May 2018, the administrative record does not definitively show whether the cyst was surgically removed. Doc. No. 51-1 at 5-6; Doc. No. 57-1 at 3-4. Avroham G. saw Dr. Patel on April 11, 2018 about "swelling on the dorsum of the left wrist" that "comes and goes." Tr. 504. Dr. Patel diagnosed him with a "dorsal wrist ganglion" and records show a follow up appointment on May 14, 2018

with Dr. Melamed.  Tr. 506.  Treatment notes from Avroham G.'s May 14, 2018 visit with Dr.

Melamed indicate that Avroham G. was seen for an evaluation of his left wrist and reported he

had a painful ganglion cyst that he wanted removed.  Tr. at 505.

There are no records specifying when Avroham G. had surgery to remove the ganglion

cyst.  On December 3, 2018, Dr. Robert Feldham,[2] wrote "myalgia,[3] status post 8 surgeries" and

"fracture in left forearm" in his treatment notes for Avroham G.  Doc. No. 51-1 at 6; Tr. 425.  On

February 4, 2019, Avroham G. was diagnosed with derangement of the left wrist joint by Dr.

David Neuman, who noted that Avroham G. had a "bony structure popping out of his hand for

over 1 year[]."  Doc. No. 51-1 at 6; Tr. 503.  A February 25, 2019 note from Dr. Neuman

assessed Avroham G. as having a recurrent ganglion cyst and referred him for hand surgery.  Tr.

502.  Between 2019 and 2022, Avroham G.'s treating providers documented continued issues

relating to his left wrist, including pain and limited range of motion.  Doc. No. 51-1 at 6-8; Doc.

No. 57-1 at 4-6; Tr. 503 (reporting in February 2019 that Avroham G. had severe pain preventing

him from performing daily activities and rated his wrist pain a 9/10), 1708-18 (indicating chronic

left wrist pain and diminished range of motion in January and February 2022).  A January 13,

2022 note from a visit with PA Roy Hammonds references five surgeries on his left wrist since

2014, including one four months prior.  Doc. No. 51-1 at 7-8; Tr. 1713.

Additionally, Avroham G. engaged in mental health treatment in Woodborne

Correctional facility from May 2015 until August 22, 2017, where he was treated for anxiety,

---

[2] The parties' motions refer to Dr. Robert Feldham as Avroham G.'s doctor from 2017 through the doctor's death in November 2021.  *See generally* Docs. No. 51-1, 57-1.  However, ALJ Molleur's decision and the February 2022 hearing transcript reference a Dr. Robert Feldman.  *See* Tr. 547, 555, 586.  The record indicates Dr. Feld**ham** and Dr. Feld**man** are the same doctor; for clarity's sake, I refer to Avroham G.'s doctor as Dr. Robert Feldham.  Tr. 419 (showing a fax Dr. Robert Feldham, MD), 1620 (referring to November 2021 visit with Dr. Robert Feldham).
[3] "Myalgia is the medical term for muscle pain, which has many causes."  *Myalgia (Muscle Pain)*, Cleveland Clinic (Oct. 01, 2024), https://my.clevelandclinic.org/health/symptoms/myalgia-muscle-pain (last visited on Sept. 30, 2025).

depression, and insomnia.  Doc. No. 57-1 at 2; Tr. 452-453.  Records from 2016-2022 show that

Avroham G. has additional diagnoses of asthma, hypertension, diabetes, neuritis,[4] a seizure

disorder, post-traumatic stress disorder (PTSD), depressive disorder, anxiety disorder, obesity,

and insomnia.[5]  Doc. No. 51-1 at 3-8; Doc. No. 57-1 at 2-6; Tr. 432 (diagnosing PTSD), 452-453

(treating anxiety, depression, and insomnia), 1098-99 (treating asthma), 1626 (noting

hypertension and neuritis), 1708 (noting obesity), 1713 (noting history of diabetes and seizure

disorder).

### 2.  *Medical Opinions*

The parties point to four consultative examinations in the administrative record:  (1) a

March 6, 2018 examination by Dr. Robert Greene; (2) a March 6, 2018 examination by Dr. John

Nikkah; (3) a January 25, 2019 examination by Dr. Vinod Thukral; and (4) a January 25, 2019

evaluation by Dr. Rachel Mayers, Psy.D.  Doc. No. 51-1 at 9-13; Doc. No, 57-1 at 2-5.

### a.  March 6, 2018 examination by Dr. Robert Greene

On March 6, 2018, Dr. Robert Greene reported Avroham G. as being on medical

disability since 2005 for "antisocial and mental issues."  Tr. 407.  Dr. Greene stated Avroham

G.'s medical problems as "diabetes, high blood pressure, anxiety, asthma, seizures, depression,

insomnia, and a left wrist ganglion cyst."  Tr. 407.  He noted a "hard, but mobile, ganglion cyst"

on Avroham G.'s left wrist but found full range of motion, intact hand and finger dexterity, and

full grip strength.  Tr. 410.  Avroham G.'s listed daily activities include cooking, cleaning, doing

---

[4] Neuritis is "inflammation in the peripheral nerves" which can include the following symptoms:  "weakness, numbness, pain, tingling sensations, loss of reflexes, muscle atrophy, or sensory disturbances (e.g., vision, balance, hearing)".  Maushmi Sheth, *What is Neuritis?*, Lone Star Neurology (July 22, 2024), https://lonestarneurology.net/neurological-disorders/what-is-neuritis/ (last visited Sept. 29, 2025).
[5] During his time in custody, Avroham G. was also diagnosed with Lichen Simplex on his ankle. Doc. No. 51-1 at 5; Tr. 403.  This diagnosis was not discussed during the February 2022 hearing and does not appear relevant to ALJ Molleur's decision.

laundry, shopping, showering and bathing himself, dressing himself, and going out.  Tr. 408.  Dr. Greene stated that Avroham G. should avoid unprotected heights, activities associated with fall risks, operating heavy machinery, and driving due to his seizure disorder.  Tr. 410.  Dr. Greene also advised avoiding smoke, dust, or other known respiratory irritants due to his asthma diagnosis.  Tr. 410.

  b.   March 6, 2018 examination by Dr. John Nikkah

Also on March 6, 2018, Dr. John Nikkah performed a consultative psychiatric evaluation at the request of the State Agency.  Doc. No. 51-1 at 10-12; Tr. 413-418.  Avroham G. "denied needing any significant assistance completing his daily tasks."  Tr. 416.  Dr. Nikkah wrote that Avroham G. "demonstrate[d] no evidence of limitation in the ability to understand, remember, and apply simple directions and instructions."  Tr. 416-17.  He noted Avroham G. exhibited mild limitations in his ability to: "understand, remember, and apply complex directions and instructions; use reason and judgment to make work-related decisions; interact adequately with supervisors, co-workers, and the public; sustain concentration and perform tasks at a consistent pace."  Tr. 417.  Additionally, Dr. Nikkah concluded Avroham G. was moderately limited in his ability to: "sustain ordinary routine and regular attendance at work;" "regulate emotions, control behaviors, and maintain well-being[;]" and "be aware of normal hazards and take appropriate precautions."  Tr. 417.  Dr. Nikkah diagnosed him with unspecified depressive disorder and unspecified anxiety disorder and suggested ruling out antisocial personality disorder.  Tr. 417.  However, Dr. Nikkah concluded that those diagnoses "do[] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis."  Tr. 417.  Dr. Nikkah recommended Avroham G. undergo individual psychological therapy, psychiatric intervention, and vocational training.  Tr. 417.

c.   Dr. January 25, 2019 examination by Dr. Vinod Thukral

During an internal medicine evaluation on January 25, 2019, Dr. Thukral listed Avroham G.'s chief complaint as complications from his 2014 left wrist fracture.  Tr. 438.  Avroham G. reported that, despite multiple surgeries, he still had sharp, intermittent, 8/10 wrist pain that was aggravated by "gripping, doing activities of daily lifting, and lifting."  Tr. 438.  Dr. Thukral examined Avroham G.'s left wrist, finding moderate swelling, tenderness on movement, and limited range of motion.  Tr. 440-41.  However, Dr. Thukral also noted that Avroham G.'s hand and finger dexterity remained intact and the grip strength in both of his hands was normal.[6]  Tr. 441.  Avroham G. did not report limitations on his daily living activities.  Tr. 439.

Dr. Thukral concluded that Avroham G. had no limitations for sitting or standing, but had "marked limitations for pulling, pushing, lifting, carrying, and any other such-related activities with the left upper extremity due to the left wrist pain as depicted [in the report]."  Tr. 441-42.  Dr. Thukral reported that none of those limitations applied to his "right upper extremity."  Tr. 442.  Despite Avroham G.'s left wrist pain, Dr. Thukra opined he could occasionally reach, handle, push, pull, finger, or feel with his left hand.  Tr. 445.  Dr. Thukral echoed Dr. Greene's recommendation of avoiding respiratory irritants, driving, and operating heavy machinery due to his asthma and seizure disorder.  Tr. 442, 447.  Dr. Thukral also concluded that Avroham G. should not be exposed to: unprotected heights; moving mechanical parts; humidity and wetness; dust, odors, fumes, and pulmonary irritants; humidity and wetness; extreme cold and heat.  Tr. 447.  Dr. Thukral opined that Avroham G. should only occasionally climb, balance, stoop, kneel, crouch or crawl for more than one third of a workday.  Tr. 446.

---

[6] Dr. Thukral states that Avroham G. is "right-handed dominant."  Tr. at 441.  However, other medical records consistently report Avroham G. as left-hand dominant, and Avroham G. testified in his February 2022 hearing that his left hand is his dominant hand.  *See* Tr. 597.

d.   January 25, 2019 evaluation by Dr. Rachel Mayers, Psy.D.

Dr. Rachel Mayers provided a psychiatric evaluation for Avroham G. on January 25, 2019.[7]  Tr. 428.  Dr. Mayers' evaluation noted that Avroham G.'s attention and concentration were mildly impaired and his recent and remote memory skills were "[i]mpaired due to limited intellectual functioning."  Tr. 430.  Avroham G. had no limitations in: understanding, remembering, or applying simple directions and instructions; sustaining ordinary routine and regular attendance at work; maintaining personal hygiene and appropriate attire; being aware of normal hazards and taking appropriate precautions.  Tr. 431.  Dr. Mayers noted Avroham G. had mild limitations in: using reason and judgment to make work related decisions; interacting adequately with supervisors, coworkers, and the public; sustaining concentration and performing a task at a consistent pace; and regulating emotions, controlling behavior, and maintaining well-being.  Tr. 431.  Dr. Mayers concluded that Avroham G. had a "moderate limitation to understand[ing], remember[ing], or apply[ing] complex directions and instructions."  Tr. 431.  She noted his limitations were "caused by cognitive deficits and PTSD."  Tr. 431.

Dr. Mayers diagnosed Avroham G. with Post Traumatic Stress Disorder and unspecified anxiety disorder.  Tr. 432.  She suggested ruling out an intellectual disability, antisocial personality disorder, and bipolar disorder.  Tr. 432.  She concluded that Avroham G.'s psychiatric diagnoses and cognitive deficits "[did] not appear to be significant enough to interfere with [his] ability to function on a daily basis."  Tr. 432.  She recommended Avroham G. resume psychological and psychiatric treatment as well as receive vocational training and rehabilitation.  Tr. 432.

---

[7] In her report, Dr. Mayers states that Avroham G. reported having wrist surgeries in 2014 and 2018, and stated he was "getting another surgery soon."  Tr. at 428.

B. <u>The ALJ Hearing and Decision</u>

1. *Hearing Testimony*

Avroham G. testified telephonically about his symptoms at the February 15, 2022 (the "February 2022 hearing") hearing before ALJ Molleur. Doc. No. 51-1 at 13-18; Tr. 575-619. Debra Horton, an impartial vocational expert, also testified telephonically at the February 2022 hearing. Doc. No. 51-1 at 13; Tr. 580, 613-617.

At the start of the February 2022, ALJ Molleur informed Avroham G. that "we are going to proceed today as if [the] first [ALJ] decision [was] never issued and as if that first hearing never occurred back in 2020. So you're getting pretty much a do-over from your 2020 hearing." Doc. No. 51-1 at 13; Tr. 580-81. Avroham G. had difficulty reviewing his case file electronically stating that he was "computer illiterate," but testified he "kn[e]w all the records that are in there." Tr. 583-84. ALJ Molleur asked for Avroham G.'s updated medical records, stating that "[t]he most recent documentation of treatment that I have for you goes back to [] 2019. I have no idea what's happened medically with you in the last two plus years." Tr. 585-86. ALJ Molleur directed Avroham G. to submit any missing medical records, including Dr. Feldham's records, by fax after the hearing. Tr. 589-90.

Avroham G. described his educational and work background to ALJ Molleur. Tr. 593-96. Avroham G. testified that he stopped traditional education at eleventh grade and did not obtain a GED. Tr. 593. He stated that the last time he worked for pay was in 2014, when he worked as a part-time medical delivery driver. Tr. 594. Avroham G. also worked at one of his prior attorney's office after his release from prison in 2018. Tr. 595. He stopped working because he had issues with co-workers and struggled with working around people. Tr. 595. He described himself as "anti-social" due to an assault in prison for which he received 58 staples and 50 stitches. Tr. 595-96. He stated that he has a driver's license but does not have a car. Tr. 596.

Avroham G. testified that he spent his days reading, going to the synagogue and talking to people, walking, and listening to music.  Tr. 604.

Avroham G.'s testimony then turned to the details of his injuries.  Tr. 597.  He testified that his left hand, the injured hand, is his dominant hand.  Tr. 597.  During the hearing, Avroham G. described the 2014 incident in which he injured his hand due to forgetting to put his vehicle in park, and how he submitted a worker's compensation claim for the incident.  Tr. 599.  He testified that he had six surgeries on his hand and that Dr. Feldham thought that he needed one more.  Tr. 601-02.[8]  Avroham G. testified that he could not pick up heavy objects, but can pick up small objects, such as a pen, a phone, or paperwork.  Tr. 608-09.  He stated that the heaviest item he could pick up would probably be a bag with "a few groceries in it."  Tr. 609.

Avroham G. listed his other medical conditions, including his seizures, asthma, diabetes, high blood pressure, and noted he is highly medicated.  Tr. 596-599.  He discussed how his diabetes affects him and how he checks his blood sugar twice a day.  Tr. 610.  When his blood sugar is high, he felt cold and shaky; however, he did not report episodes where he almost passed out.  Tr. 611-12.

Avroham G. described being recently admitted to an emergency room two months prior due to seizures.  Tr. 597-99.  He testified that he was admitted to the hospital for three days, released, and then "went back again" for another three days.  Tr. 597-99.  There was some confusion regarding which emergency room he had visited, and Avroham G. stated that he was admitted to the "Hartford Hospital Emergency Room . . . St. Mary, Saint . . . something."  Tr. 598.  ALJ Molleur stated that he did not have those records and asked Avroham G. to send them.  Tr. 598.

---

[8] Dr. Feldham passed away in November 2021. Tr. 590.

After Avroham G. finished testifying, Debra Horton ("Debra H."), a vocational expert, testified about Avroham G.'s past work, his hypothetical work eligibility for other work, and the amount of those jobs existing in the national economy.  Doc. No. 51-1 at 17; Tr. 613-617.  Debra H. characterized Avroham G.'s past work as a "courier" and testified that Avroham G. could not perform his past work due to his current restrictions.  Tr. 613-14.  ALJ Molleur posed a hypothetical to identify jobs accommodating Avroham G.'s functional limitations, including "only frequent handling and fingering with the left hand."  Tr. 614.[9]  Debra H. identified several examples of "unskilled work that would be feasible under [ALJ Molleur's hypothetical[:]" marking clerk (130,000 jobs in the national economy); routing clerk (104,000 jobs in the national economy); and checker (4,400 jobs in the national economy).  Tr. 614.

Next, ALJ Molleur posed a second hypothetical that was identical to the first, but the "person is limited to only occasional handling and fingering with the [dominant] hand" and that hand functions as more of a "helping or support hand" when "lifting and carrying."  Tr. 614-615.  At first, Debra H. testified that the previously listed jobs of marking clerk, routing clerk, and checker were no longer feasible.  Tr. 615.  She stated that the job of office helper would be feasible, but the number of available positions in the national economy would be reduced by 50% due to Avroham G.'s dominant hand limitation.  Tr. 615.  She indicated that there are 5,000 office helper jobs in the national economy.  Tr. 615.  She then revised her prior statement and testified that, when accounting for the additional limitations in handling and fingering, there were 2,200 checker jobs and 52,000 routing clerk jobs in the national economy.  Tr. 615.

---

[9] ALJ Molleur included the following additional occupational limitations in both hypotheticals:  "light work, as defined in the regulations," in a low stress environment; avoiding "work environments with higher concentrations of dust, fumes, gases or other pulmonary irritants"; requiring "no more than occasional decision making or changes in the work setting"; avoiding "tandem or other team[-]oriented work"; avoiding unprotected heights; and not involving climbing "ladders, ropes or scaffolds."  Tr. 614-17.

Debra H. also testified that, for the listed jobs, typical employer tolerance for off-task behavior is "less than 10%, so 9% or less," with a typical tolerance for absenteeism is an average of "less than one absence per month, approximately ten per year." Tr. 616-617. She testified that a person requiring unscheduled breaks, leaving, or going off task for "approximately 60 to 90 minutes per day over and above scheduled breaks" would be unable to perform the jobs she listed. Tr. 616. She also stated a person requiring two to three absences per month would not be able to perform competitive employment in "entry level[,] unskilled jobs." Tr. 616-17.

### 2. *The ALJ's Decision*

Following the hearing, the ALJ issued a decision unfavorable to Avroham G. on May 31, 2022. Tr. 543-574.[10] At step one, ALJ Molleur found that Avroham G. had not engaged in substantial gainful activity since his application date of December 29, 2017. Tr. 550. At step two, ALJ Molleur found Avroham G. had the following severe impairments: "obesity, status post left wrist fraction with ganglion, post-traumatic stress disorder (PTSD), depressive disorder, anxiety disorder, [and] asthma." Tr. 550. ALJ Molleur stated those severe impairments "significantly limit [Avroham G.'s] ability to perform basic work activities." Tr. 550. Additionally, ALJ Molleur listed Avroham G. as having the following non-severe impairments: seizure disorder, diabetes, diabetic retinopathy, and hypertension. Tr. 550-51. ALJ Molleur reasoned that those conditions would have "no more than a minimal effect on [Avroham G.'s] ability to meet the basic demands of work activity," because they "were being managed medically[] and should be amenable to proper control by adherence to recommended medical management and medication compliance." Tr. 550-51. ALJ Molleur concluded that Avroham

---

[10] ALJ Molleur's decision states that Avroham G. alleged disability beginning December 1, 2016, although the record shows Avroham G. alleged disability beginning November 1, 2006. Tr. 546, 275.

G.'s bilateral lower extremity paresthesia was not a medically determinable impairment.  Tr.

551.  At step three, ALJ Molleur determined that Avroham G. lacks an impairment or

combination of impairments that would meet the severity of an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  Tr. 551-553.

In determining Avroham G.'s residual functioning capacity (RFC), the ALJ found he

could perform light work as defined in 20 C.F.R. § 416.967(b), except with the following

limitations:  only frequent handling and fingering with the left hand; avoiding work

environments with higher concentrations of dusts, fumes, and gasses; only a low stress

environment requiring no more than occasional decision making or changes in the work setting;

and avoiding tandem or team-oriented work.  Tr. 553.  The ALJ also made an adverse credibility

finding regarding Avroham G.'s symptoms, noting that Avroham G.'s statements regarding "the

intensity, persistence and limiting effects of [those] symptoms are not entirely consistent with the

medical evidence and other evidence in the record."  Tr. 554; Doc. No. 51-1 at 19.  ALJ Molleur

found that while Avroham G. "has impairments that more than minimally impact his ability to

engage in work related activities," he was not "persuaded that the degree of impairment renders

him disabled."  Tr. 557.  Specifically, ALJ Molleur noted that, despite Avroham G.'s chronic left

wrist pain, diminished range of motion, and multiple surgeries, medical examinations show

intact hand and finger dexterity and full grip strength in both hands.  Tr. 555-56.

Further, ALJ Molleur disagreed with Dr. Greene's and Dr. Thukral's opinions that

Avroham G. should avoid unprotected heights, operating heavy machinery, moving mechanical

parts, or driving because Dr. Greene's 2018 report stated Avroham G.'s "last seizure was six to

seven years ago."  Tr. 558-59, 407.  ALJ Molleur also stated Dr. Nikkah's opinion that Avroham

G. "had limitations in understanding, remembering, [] applying complex instructions, sustaining

concentration[,] . . . performing tasks at a consistent pace, and sustaining regular attendance" was "unpersuasive." Tr. 559. ALJ Molleur came to this conclusion because Dr. Nikkah's and Dr. Mayers' evaluations reported Avroham G. could "perform simple calculations," "had no problems with immediate recall," do laundry, shop independently, "prepare simple meals, and take public transportation." Tr. 559. ALJ Molleur concluded that evidence Avroham G. could complete those tasks "is not consistent with a limitation to simple tasks or expected absenteeism."[11] *Id.*

ALJ Molleur determined that Avroham G. was unable to perform any past relevant work at step four. Tr. 560. Finally, at step five, ALJ Molleur concluded Avroham G. "is capable of making a successful adjustment to other work [existing] in significant numbers in the national economy" and is, therefore, not disabled. Tr. 560-562. ALJ Molleur cited only the numbers provided by Debra H. in response to his first hypothetical, which involved "frequent handling and fingering with the left hand." Tr. 561. *See* Tr. 614 (listing the occupations of marking clerk (130,000 jobs nationally); routing clerk (104,000 jobs nationally); and checker (4,400 jobs nationally)).

## III.    Discussion

On appeal, Avroham G. argues that: (1) the ALJ failed to properly inform Avroham G. of his right to counsel and his waiver was neither knowing or voluntary; (2) the ALJ did not fully develop the administrative record; (3) the ALJ inadequately considered Avroham G.'s claims of pain; and (4) the ALJ's step five findings are unsupported. *See generally* Doc. No. 51-1 at 20-37. The Commissioner responds by arguing that substantial evidence supports the ALJ's RFC

---

[11] ALJ Molleur also cited Avroham G.'s ability to file a "complaint in U.S. District Court without" an attorney and to "correspond[] competently" with him as evidence against finding him disabled. Tr. at 559.

finding, the Commissioner met his burden at step five, the ALJ fully developed the record, and Avroham G. knowingly and intelligently waived his right to representation. *See* Doc. No. 57-1 at 9-22. As explained below, I conclude that the ALJ committed legal error by failing to affirmatively develop Avroham G.'s complete medical record, and the ALJ's RFC determination was unsupported by substantial evidence.

A. <u>Whether the ALJ failed to properly inform Avroham G. of his right to counsel and his waiver was neither knowing or voluntary</u>

Avroham G. argues that he was not properly informed of his right to counsel and his waiver was not knowing and voluntarily made. Doc. No. 51-1 at 20-21. Avroham G. argues ALJ Molleur's question that Avroham G. understood "his rights to representation because [Avroham G.] had [an attorney] last time, right?" did not constitute a knowing and voluntary waiver. *Id.* at 23. He contends that his waiver was not legally sufficient because ALJ Molleur did not inform him "of the availability of representation by an attorney on a contingent fee basis, nor did [ALJ Molleur] advise [Avroham G.] of the availability of no-charge legal representation. *Id.* at 21. For the following reasons, Avroham G.'s claim that he was not properly informed of his right to counsel fails.

A claimant has a statutory and regulatory right to be represented if they choose to obtain counsel. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 406; 20 C.F.R. § 404.1705). Claimants must receive written notice of their options for obtaining an attorney to represent them at their hearing and "the availability of organizations which provide legal services free of charge to qualifying claimants." *Id.* (citation modified) (quoting 42 U.S.C. §§ 406(c), 1383(d)(2)(D)). At the hearing, "the ALJ must ensure that the claimant is aware of [that] right." *Robinson v. Sec'y of Health & Hum. Servs.*, 733 F.2d 255, 257 (2d Cir. 1984).

The Second Circuit holds that a claimant is "sufficiently on notice" when they receive written notice of their right to representation and the availability of free legal services prior to the hearing and when an ALJ states at the hearing that the claimant has the right to be represented. *Lamay*, 562 F.3d at 507-509.  ALJ Molleur did not have to provide Avroham G. notice beyond the "statutory notice requirements of [s]ections 406(c) and 1383(d)(2)(D)."  *Id.* at 509.[12]

The administrative record verifies that Avroham G. received written notice of his right to representation with his hearing notice.  *See* Tr. 749-50, 754-55.  A December 17, 2021 report of contact by the SSA hearing office confirms that Avroham G. requested and was sent a copy of "legal aid" information.  Tr. 857.  At the hearing, ALJ Molleur provided Avroham G. with the following notice:

> ALJ:  You do have the right to be represented by an attorney or non-attorney representative.  That person can help you obtain records, explain the medical terms to you, make requests on your behalf and present evidence in the light most favorable to your case.  You might have seen documents in your Hearing Notice telling you about your right to representation.  Do you recall seeing those?
>
> [Avroham G.]:  Yes.
>
> ALJ:  All right. You had a representative at your prior hearing in 2020, correct?
>
> [Avroham G.]:  Yes.
>
> ALJ:  Mr. Graybill withdrew, I guess while your appeal was pending or right after the case came back from the District Court, correct?
>
> [Avroham G.]:  Yes.
>
> ALJ:  All right.  Do you want to have an attorney help you with your case now?
>
> [Avroham G.]:  No, basically . . . the reason why he pulled away because –

---

[12] *See* 42 U.S.C. § 406(c), § 1383(d)(2)(D) ("The Commissioner of Social Security shall notify each claimant in writing, together with the notice to such claimant of an adverse determination, of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner of Social Security.  Such notification shall also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge.").

> ALJ:  I don't want you to get into any communications you had with your attorney . . . [t]hat's the attorney client privilege, so I don't need to hear about that.
>
> [Avrohom G.]:  Okay, I'm sorry.  I would like to proceed on my own.
>
> ALJ:  Okay, but you do understand your rights to representation because you had one the last time, right?
>
> [Avroham G.]:  Yes, sir.
>
> ALJ:  All right, so I'll find you then a knowing and voluntary waiver of your right to representation.  I will go ahead and hear your case today.

Tr. 582-583.  ALJ Molleur clearly advised Avroham G. of his right to be represented by a lawyer or a non-attorney representative.  Tr. 582-83.  He also confirmed that Avroham G. received documents describing his right to representation.  Tr. 582.  Avroham G. explicitly stated that he would like to proceed "on [his] own" and without representation.  Tr. 583.  At that point, ALJ Molleur had no reason to doubt Avroham G. knowingly and voluntarily waived his right to an attorney.  ALJ Molleur's additional question that Avroham G. understood his right to representation because he "had one last time" was merely additional confirmation and did not comprise his entire waiver.  Tr. 583.

ALJ Molleur's notice at the hearing, along with the written notice and legal aid information provided to Avroham G. before the hearing, demonstrate that Avroham G. knowingly and voluntarily waived his right to an attorney.  Accordingly, Avroham G.'s argument that he was not properly informed of his right to counsel and his waiver was not knowing and voluntarily made fails.

## B. Whether the ALJ fully developed the administrative record and whether the ALJ's RFC findings were supported by substantial evidence

Avroham G. also argues that "there are significant gaps in the [a]dministrative [r]ecord." Doc. No. 51-1 at 24-30.  Avroham G. points to several medical conditions for which medical

records likely existed, but for which the record was not fully developed:  (1) "the complete lack of mental health records from December [] 2017 forward[;]" (2) treatment and hospitalizations related to Avroham G.'s seizure disorder; and (3) records related to Avroham G.'s wrist surgeries.  *Id.*  The Commissioner responds that Avroham G. also had a responsibility and opportunity to ensure important records were submitted.  Doc. No. 57-1 at 16-17.  Specifically, the Commissioner argues that ALJ Molleur "left the record open in order for [Avroham G.] to submit additional evidence," including evidence of his seizure-related hospitalization.  *Id.* at 17. Further, the Commissioner asserts that Avroham G.'s testimony during the hearing and statements in his consultative evaluations did not demonstrate an obvious need to request additional records.  *Id.* at 16-19.

In Social Security proceedings, ALJs have a duty to affirmatively develop the record, investigate the facts, and develop arguments "both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000); *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (stating ALJs are required to develop the record of a claimant's complete medical history for "at least a twelve-month period if there was reason to believe that the information was necessary to reach a decision.").  An ALJ's duties are "heightened" when a claimant proceeds *pro se.  Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).  "[W]hen the claimant is unrepresented, the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts . . . ."  *Cruz*, 912 F.2d at 11 (internal citation and quotation marks omitted).

In determining whether an individual has a disability, the Commissioner:

[S]hall consider all evidence available in such individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability. In making any determination the Commissioner of Social Security shall make every

> reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary . . . to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis.

42 U.S.C. § 423(d)(5)(B).  The Social Security Act's ("SSA's") implementing regulations also direct the ALJ to "develop [a claimant's] complete medical history for at least the 12 months preceding the month in which" a claimant files an application, unless "development of an earlier period is necessary."  20 C.F.R. § 404.1512(b) (defining "completed medical history" as the records of a claimant's medical sources for at least a year preceding the month the claimant files an application).  Developing a claimant's complete medical history requires the ALJ to "make every reasonable effort to help [a claimant] get medical evidence from [their] own medical sources and entities that maintain [their] medical source's evidence" when the claimant gives "permission to request the reports."  *Id.*  "Every reasonable effort" means making "an initial request for evidence from [a claimant's] medical source or entity that maintains [their] medical source's evidence."  *Id.*  If evidence is not received "between 10 and 20 calendar days after the initial request," the ALJ "will make one follow-up request to obtain the medical evidence necessary to make a determination."  *Id.*

　　Although the "general rule" is that a court "must sustain a final decision by the Secretary if it is supported by 'substantial evidence' on the record as a whole," the SSA "is remedial or beneficent in purpose" and must be "'broadly construed and liberally applied.'"  *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) (quoting *Gold v. Sec'y of Health, Ed. & Welfare*, 463 F.2d 38, 40-41 (2d Cir. 1972).  *See also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").  "[C]ourts have not hesitated to remand for the taking of additional evidence, on good cause shown, where relevant, probative, and available

evidence was either not before the Secretary or was not explicitly weighed and considered by him, although such consideration was necessary to a just determination of a claimant's application." *Cutler*, 516 F.2d at 1285.

An ALJ fails to develop the record if there is insufficient evidence or a significant gap in the record. *See Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 644-45 (2d Cir. 2020) (remanding with instructions to develop the record because there was "an obvious gap in the medical records," the ALJ's "cited evidence was stale," and the newer record "directly contradict[ed] the older reports . . . on which the ALJ relied). Further, "[c]ourts have remanded in cases where, absent a treating source opinion, an ALJ failed to provide an adequate explanation for their decision, relied on stale medical opinions or an incomplete or ambiguous record, or the underlying treatment record suggested much more significant limitations than opined." *Edwards v. Comm'r of Soc. Sec. Admin.*, 2023 WL 6173526, at *17 (S.D.N.Y. Sept. 22, 2023).

There are concerning gaps in the medical record for the twelve months prior to Avroham G.'s February 2022 hearing regarding Avroham G.'s seizure disorder and left wrist injury. Consistent with Avroham G.'s testimony about his hospitalization, ALJ Molleur requested records twice from Hartford Hospital; however, Avroham G. also mentioned the name of the hospital was "S[ain]t Mary, . . . Saint something." Tr. 598 (answering affirmatively that Avroham G. went to the Harford Hospital emergency room and that the name of the hospital related to a saint), 1658-60 (requesting records from Hartford Hospital on March 2, 2022), 1667-69 (requesting records from Hartford Hospital on March 16, 2022). ALJ Molleur attempted to obtain records from the hospital that Avroham indicated he visited. However, Avroham G.

argues that the records "should have been sent to [ ] Saint Francis Hospital in Harford."  Doc.
No. 51-1 at 25.

The absence of Avroham G.'s hospitalization records created an "obvious gap" in the
record that ALJ Molleur should have more thoroughly investigated.  *Lopez v. Comm'r of Soc.*
*Sec.*, 622 F. App'x 59, 61 (2d Cir. 2015) (remanding due to the ALJ's failure to investigate a *pro*
*se* claimant's testimony about a four-day hospitalization); *Morris v. Berryhill*, 721 F. App'x 25,
28 (2d Cir. 2018) ("[A]n overnight hospital stay is likely to be a serious and critical medical
event that could materially change the weight of the evidence on the disability determination[] . .
. .").  Based on Avroham G.'s testimony, a "reasonable effort" to obtain his records from his
seizure-related hospitalization would involve requesting records from both Hartford Hospital and
Saint Francis Hospital.  *See* 20 C.F.R. § 404.1512(b).  The potential relevance of those records to
Avroham G.'s RFC, combined with ALJ Molleur's heightened duty to "scrupulously and
conscientiously" probe into those records, required a more thorough investigation of Avroham
G.'s seizure-related hospitalization.  *See Cutler*, 516 F.2d at 1286.  Consideration of Avroham
G.'s seizure-related hospital records was necessary for a "just determination" of his disability
benefits application.  *Id.* at 1285.

Another significant gap in the record is objective medical evidence relating to Avroham
G.'s left wrist and its current condition.  It is unclear from the record when Avroham G. had
surgery for his ganglion cyst, although he reported having his most recent surgery four months
prior to his January 13, 2022 appointment with PA Roy Hammonds.  Tr. 1713.  During the
hearing, ALJ Molleur asked Avroham G. about what was "the plan for [his] hand now[.]"  Tr.
601.  Avroham G. responded that Dr. Feldham thought that he needed to do one more surgery,
and that Dr. Feldham sent him to "HMU."  Tr. 601-02.  When ALJ Molleur responded that he

saw records from EMU Health, Avroham G. confirmed that was the correct name for the medical provider.  Tr. 602.  ALJ Molleur then stated the Hearing Office would obtain Avroham G.'s permission to request the records after the hearing and that ALJ Molleur would "get those records."  Tr. 602-03.  Nevertheless, the parties point to no records from EMU Health, nor any other surgeon, clearly documenting Avroham G.'s surgery.  The only surgery records appear to be from an August 2014 surgery with Montvale Surgical Center.  Tr. 500-501.  In fact, ALJ Molleur misstates the record in his decision, writing "the only other evidence of surgery was a notation for metal plates inserted in his wrist in August 2021."  Tr. 555.  Avroham G.'s record contradicts that statement, with medical records indicating he already had a metal implant inserted in September 2015.  Tr. 1082.

Many of Avroham G.'s pre-2022 records are from Dr. Feldham, whose visit summaries are at times illegible and incomprehensible, particularly in the year preceding Avroham G.'s February 2022 hearing.  *See* Tr. 419-25, 1615-16, 1618-19, 1621, 1623, 1626-27, 1629, 1631, 1633, 1635.  "Where [ ] medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation."  *Cutler*, 516 F.2d at 1285.  It is difficult to discern from Dr. Feldham's records almost any information about Avroham G.'s wrist, including when he had wrist surgery.  Dr. Feldham's records contain little information on Avroham G.'s pain levels and functionality, other than confirming he was prescribed pain medication.  *See, e.g.,* 1615-16 (prescribing Percocet), 1635 (prescribing oxycodone).  ALJ Molleur came to a similar conclusion in his decision, characterizing Dr. Feldham's treatment records from 2019 through 2021 as "hav[ing] a limited narrative, with no evidence of a referral for . . . surgery."  Tr. 555.

The gap in medical evidence concerning Avroham G.'s left wrist impeded ALJ Molleur's ability to evaluate Avroham G.'s current functional limitations and pain levels. The available records from EMU Health, Dr. Patel, and Dr. Melamed show that Avroham G. had multiple surgeries on and a multi-year history of pain in his left wrist. Tr. 502-07. However, they do nothing to elucidate Avroham G.'s care for the preceding twelve months before the hearing, *i.e.*, Avroham G.'s "complete medical history." *See* 20 C.F.R. § 404.1512(b) (defining "completed medical history" as the records of a claimant's medical sources for at least twelve months preceding the claimant's application). Further, the consultative evaluations describing Avroham G.'s wrist pain and limitations were conducted March 6, 2018 and January 25, 2019, over three years prior to Avroham G.'s February 2022 hearing before ALJ Molleur. Notably, ALJ Molleur remarked at Avroham G.'s February 2022 hearing that "[t]he most recent documentation of treatment that I have for you goes back to [] 2019. I have no idea what's happened medically with you in the last two plus years." Tr. 586. ALJ Molleur relied primarily on medical record evidence from the 2018 and 2019 consultative evaluations and a recent primary care visit in 2022 in determining Avroham G.'s functional limitations related to his left wrist, indicating that evidence from the twelve months prior was not used to evaluate his RFC. Tr. 554-60.

In addition to the troubling gaps in Avroham G.'s medical record,[13] ALJ Molleur disregards some of the evaluator's conclusions despite relying on Avroham G.'s 2018 and 2019 consultative evaluations to determine Avroham G.'s RFC.[14] ALJs do not have to accept the

---

[13] The gaps in Avroham G.'s medical record are unlike circumstances in which courts have declined to reverse and remand a Commissioner's decision. *See Morris v. Berryhill*, 721 F. App'x 25, 28 (2d Cir. 2018) (declining to remand because there was no indication the "potentially missing records . . . contain significant information" and it was "not even clear" any records were actually missing); *Tiffany T. v. Comm'r of Soc. Sec.*, 2023 WL 10949091, at *5 (D. Conn. Sept. 1, 2023) (declining to remand when it was unclear what records were missing and there was no indication the records would contain significant information).

[14] An individual's RFC is their "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). The ALJ is responsible for "assess[ing]" a claimant's RFC "based on all the relevant evidence in [their] case record." 20 C.F.R. §

conclusions of consulting physicians, but an ALJ "cannot arbitrarily substitute his own judgment for competent medical opinion." *McBrayer v. Sec'y of Health & Hum. Servs.*, 712 F.2d 795, 799 (2d Cir. 1983); *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (finding the ALJ "failed to provide the compelling critique needed to overcome the uncontradicted medical opinion of [the consultative physician]" when it was the only opinion addressing the claimant's impairments). *But see Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) ("[A] consulting physician's opinions or report should be given limited weight."). ALJ Molleur rejected several functional limitations recommended by consulting physicians without evidence supporting his conclusions.

ALJ Molleur did not agree with Dr. Greene's and Dr. Thukral's opinions on Avroham G.'s functional limitations due to his seizure disorder. Tr. 558-59. Specifically, he rejected the recommendation by both Dr. Greene and Dr. Thukral that Avroham G. avoid unprotected heights, operating heavy machinery, moving mechanical parts or driving. Tr. 558-59. ALJ Molleur supported his conclusion by stating Dr. Greene's 2018 report noted Avroham G.'s last seizure was six to seven years ago. Tr. 558-59, 407. He characterized Dr. Greene's recommendation as "inconsistent" with Dr. Thukral's 2019 report, which noted his last seizure was in 2018. Tr. 558-59; Tr. 439 (stating Avroham G. had not had seizure episodes since "2018"). There is nothing inconsistent about Avroham G. reporting that he had not had a seizure for six to seven years in 2018, then reporting one year later that he had a seizure in 2018. Fairly read, the March 2018 and January 2019 reports show that Avroham G. had a seizure between the March 2018 and January 2019 reports and, therefore, the functional limitations related to his

---

404.1545(a)(1). Additionally, the ALJ is required to "consider all" of a claimant's "symptoms, including pain, and the extent to which [their] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a).

seizure disorder were both relevant and consistent.  Further, Avroham G.'s testimony that he had

a seizure episode resulting in hospitalization just two months prior to the hearing renders those

limitations consistent and supported by the medical record.  *See* Tr. 597-98.

ALJ Molleur also rejected Dr. Thukral's conclusion that Avroham G. "could only

occasionally handle or finger with the left hand" because his examination found Avroham G. had

"intact hand and finger dexterity and full grip strength."  Tr. 558.  Additionally, he determined

Dr. Thukral's opinion on Avroham G.'s "lifting and carrying limitations, postural limitations and

use of the hands" were inconsistent with "Dr. Greene's previous examination" in 2018.  Tr. 558.

In so doing, ALJ Molleur relied upon an earlier, stale medical opinion that did not explicitly

address Avroham G.'s functional limitations.

ALJ Molleur failed to develop Avroham G.'s complete medical record because there was

an obvious gap in Avroham G.'s medical record, his "cited evidence was stale," and newer

evidence contradicts the older evidence on which ALJ Molleur relied.  *Blash v. Comm'r of Soc.*

*Sec. Admin.*, 813 F. App'x 642, 644-45 (2d Cir. 2020).  ALJ Molleur's decision was based on

both an incomplete and ambiguous medical record and outdated medical opinions.  *Edwards v.*

*Comm'r of Soc. Sec. Admin.*, 2023 WL 6173526, at *17 (S.D.N.Y. Sept. 22, 2023).  The gaps in

Avroham G.'s record concerning his wrist injury and his seizure disorder leave ALJ Molleur's

RFC determination unsupported by substantial evidence.[15]  *Williams v. Bowen*, 859 F.2d 255,

258 (2d Cir. 1988) ("Substantial evidence has been defined as such relevant evidence as a

---

[15] Although there is a conspicuous absence of mental health treatment records after 2017, Avroham G. testified that
he was not receiving mental health treatment.  *See* Tr. 589 ("ALJ: So, you have not gotten any kind of mental health
counseling, no emergency room visits, no hospitalizations? [Avroham G.]: No . . . ."); Tr. 604 ("[ALJ:] Are you
getting any mental health treatment right now? [Avroham G.:] No.").  Therefore, ALJ Molleur had no reason to
suspect additional records existed or know from whom he should request them.

reasonable mind might accept as adequate to support a conclusion . . . .") (internal citation and quotation marks omitted).

Accordingly, I **grant** Avroham G.'s motion to reverse the decision of the Commissioner, doc. no. 51, and **deny** the Commissioner's motion to affirm, doc. no. 57.

I do not address Avroham G.'s remaining arguments concerning ALJ Molleur's consideration of Avroham G.'s complaints of chronic pain and ALJ Molleur's step-five analysis because ALJ Molleur did not adequately develop the record and his RFC determination was not supported by substantial evidence.

## IV.    Conclusion

For the foregoing reasons, I **grant** Avroham G.'s motion to reverse the decision of the Commissioner.  Doc. No. 51. The Commissioner's motion to affirm is **denied**.  Doc. No. 57.  I **deny as moot** the Commissioner's first motion to affirm. Doc. No. 44.

The decision of the Commissioner is **reversed and remanded**.  On remand, the ALJ is instructed to affirmatively and fully develop Avroham G.'s complete medical record.  Ideally, Avroham G.'s attorney will assist in the effort to obtain and submit records, explain medical terms, make requests on his behalf, and present evidence in the light most favorable to his case.

The Clerk shall enter judgment, effect remand to the Commissioner, and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 30th day of September 2025.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge